MERCHANTS NATIONAL BANK OF INDIANAPOLIS v.
W. A. BRANSON ET AL.

(Filed 8 April, 1914.)

1. Bills and Notes—Fraud—Holder in Due Course—Burden of Proof.

Where fraud in the execution of a negotiable note has been shown, the burden of proof is on the plaintiff, an indorser thereof, and claiming as a holder in due course, to show not only that he acquired the paper for value before maturity, but also without notice of the infirmity of the instrument. Revisal, secs. 2201, 2208.

2. Same—Constructive Notice.

Where the plaintiff sues on a negotiable note, claiming to be a holder in due course, and fraud in its execution is shown, the defendant may prove actual or constructive notice of fraud in rebuttal of the plaintiff's evidence, if he has offered sufficient proof to require it, or he may rely upon the plaintiff's own evidence upon the issue as to whether he knew or should have known of it.

3. Same—"Without Recourse"—Trials—Evidence.

An Indiana bank sued the maker of a note, given for a Percheron horse, in our courts, the execution of which was shown to have been procured by the fraud of the payee. The testimony of the plaintiff's cashier, in its behalf, tended to show that the payee, a corporation, already owing the bank in a large amount, executed its note to the bank, indorsed by one of its solvent officers, and pledged the note in question with a number of like notes, all indorsed without recourse, as collateral, without any investigation of the solvency of their makers; and, at the request of the payee, agreed to have recourse against the makers of the collateral notes before suing the payee and its indorser on the principal note, and who lived in the same city with the plaintiff.

His testimony was conflicting as to whether the plaintiff really accepted the collateral notes without recourse: *Held*, that while the indorsement without recourse was no evidence upon whether the plaintiff acquired the note sued on as a *bona fide* purchaser without notice of its imperfection, it was sufficient to go to the jury, taken in connection with the other circumstances of the case.

APPEAL by defendant from *Lane, J.,* at January Term, 1914, of GUILFORD.

Action to recover $600, the amount of one of two notes given in the purchase of a Percheron horse. Defendant pleaded that the note was obtained by the fraud of the payee, Maywood Stock Farm Importing Company, which had indorsed it "without recourse" to the plaintiff, with other notes of a like kind aggregating $35,285.62, as collateral to secure loans made and to be made by the bank to the payee, the said importing company. The fraud was admitted by the plaintiff, and the sole question is, whether the plaintiff was a purchaser of the note in due course.

Oscar F. Frenzel, cashier of the bank and witness for the plaintiff, testified that neither he nor any of its officers had notice of the fraud. He further testified:

Q. When indorsed without recourse, how can you use it as a collateral note to secure the payment of loans and advances? A. Well, I suppose we can use it. At least, we took it so.

Q. So indorsed, have you an action against the Maywood Stock Farm Importing Company or its president, Sterling R. Holt, on this note, if it is not collected? A. No, sir.

Q. Then, Mr. Frenzel, that being so, it is really not a collateral note, is it? A. Yes, sir; it is.

Q. Then, really, you would have an action, as this is a collateral account of the Maywood Stock Farm Importing Company, against its said account or against Sterling R. Holt, its president, would you not? A. We would.

Q. You said a moment ago you would not. A. If they were solvent.

Q. Then you do have an action against the company, Maywood Stock Farm Importing Company, or against its president,

·Sterling R. Holt, for the payment of the note or notes for which this note is a part of the collateral? A. We do.

Q. Did your bank make a practice of taking notes indorsed without recourse, made by farmers in another State, about whom you have no possible way of securing information as to their financial standing? A. It does not.

Witness was then asked, on cross-examination, by questions addressed to him as to each one of the makers of the note, if he knew of any of them, and to each question he answered that he did not. He was then asked if he made any inquiry about their financial standing and ability, before taking the notes for the bank, and he stated, in reply, that he had not; that he took the notes with an indorsement "without recourse," because the Maywood Stock Farm Importing Company, the payee, insisted upon it.

Q. Have you an understanding with the Maywood Stock Farm Importing Company, or with Sterling R. Holt, its president, or with any of its officers, that if you do not collect this note of its makers, that the Maywood Stock Farm Importing Company, or Sterling R. Holt, or any of its officers, will pay this note? A. No, sir.

Q. How do you expect to collect the other notes against them, indorsed without recourse, if they have gone out of business? If they have gone out of business, how do you expect to collect other notes or the note itself given by the Maywood Stock Farm Importing Company, of which the note sued on is collateral? A. That is a question; we will have to try and find something.

Q. How do you expect to collect? A. Well, I think they have some property, and we may be able to collect it from Mr. Holt.

Q. Mr. Holt is solvent, isn't he? A. I think he is.

Q. Then, really, you can collect the amount of the note for which you say the note sued on and the other notes were given as collateral? A. We don't know. I am not positive.

Q. You have made no attempt to collect, have you? A. No, sir; we have not attempted to collect it because they insisted on our collecting the collateral first.

Q. Mr. Frenzel, did you or did you not receive a letter from an attorney representing the defendants, before suit was brought, stating that they refused to pay this note because of fraud on the part of the indorser or transferrer? A. I never saw such a letter.

The plaintiff objected to this testimony, which was elicited on cross-examination of its witness, as irrelevant, and moved the court to suppress that part of the witness's deposition, which motion was denied, and plaintiff excepted.

The court charged the jury in part as follows: "If you find from the evidence in this case, and by its greater weight, that notwithstanding there was fraud used in the procurement of the signatures to the note, that this plaintiff, the Merchants National Bank of Indianapolis, purchased this note in good faith, without notice of any infirmity or defect, and before maturity and for value, you will answer the second issue 'Yes.' Unless you so find by the greater weight of the evidence, you will answer the second issue 'No.'" The jury returned the following verdict:

1. Were the signatures to the note sued on procured by fraud? Answer: Yes.

2. Did the plaintiff purchase said note in good faith and without notice of any infirmity or defect and before maturity and for value? Answer: No.

3. Are the defendants indebted to the plaintiff, and if so, in what amount? Answer: Nothing.

Judgment was entered for defendants on the verdict, and plaintiff appealed.

*Alfred S. Wyllie for plaintiff.*

*B. L. Fentress, T. E. Whitaker, and A. Wayland Cooke for defendant.*

WALKER, J., after stating the case: The fraud in the execution of the note being admitted, the burden was cast upon the plaintiff to show that he was a holder in due course, which means that the instrument was taken under the following circumstances: (1) That the instrument is complete and regular

upon its face; (2) That he became the holder of it before it was overdue and without notice that it had been previously dis- honored, if such was the fact; (3) That he took it in good faith and for value; (4) That at the time it was negotiated to him, he had no notice of any infirmity or defect in the title of the person negotiating it. Revisal, sec. 2201. This was so before the enactment of the Negotiable Instruments Law, Revisal, vol. 1, ch. 54. "Where the maker of negotiable paper shows that it has been obtained from him by fraud, a subsequent transferee must, before he is entitled to recover thereon, show that he is a *bona fide* purchaser or that he derived his title from such a pur- chaser. It is not sufficient to show simply that he purchased before maturity and paid value; he must show that he had no knowledge or notice of the fraud." *Vosburg v. Diefendorf,* 119 N. Y., 357; *Tatam v. Haslar,* 23 Q. B. Div. (1889), p. 345; and *Bank v. Fountain,* 148 N. C., 590, and cases cited. The terms of our statute, with reference to the burden of proof in such cases, are as follows: "Every holder is deemed *prima facie* to be a holder in due course, but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as holder in due course." Revisal, sec. 2208. It is further provided that, "The title of a person who negotiates an instrument is defective within the meaning of this chapter when he obtains the instrument, or any signature thereto, by fraud, duress, or force and fear or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith or under such circumstances as amount to a fraud."

With reference to these provisions of the statute, this Court said, by *Justice Hoke,* in *Bank v. Fountain, supra:* "The fraud having been established or having been alleged, and evidence offered to sustain it, the circumstances and *bona fides* of plain- tiff's purchase were the material questions in the controversy; and both the issue and the credibility of the evidence offered tending to establish the position of either party in reference to it were for the jury and not for the court. *S. v. Hill,* 141 N. C.,

771; *Riley's case,* 113 N. C., 651." And again: "As heretofore
stated, when fraud is proved or there is evidence tending to es-
tablish it, the burden is on the plaintiff to show that he is a
*bona fide* purchaser for value, before maturity, and without no-
tice, and the evidence must be considered as affected by that
burden. If, when all the facts attendant upon the transaction
are shown, there is no fair or reasonable inference to the con-
trary permissible, the judge could charge the jury, if they be-
lieved the evidence, to find for plaintiff, the burden in such case
having been clearly rebutted. But the issue itself and the credi-
bility of material evidence relevant to the inquiry is for the
jury, and it constitutes reversible error for the court to decide
the question and withdraw its consideration from the jury."
And that case has been approved and followed in more recent
decisions with reference to this very question. *Myers v. Petty,*
153 N. C., 462; *Trust Co. v. Ellen,* 163 N. C., 45; *Bank v.
Exum, ibid.,* 199; *Manufacturing Co. v. Summers,* 143 N. C.,
102; *Park v. Exum,* 156 N. C., 231; *Vaughan v. Exum,* 161
N. C., 494; *Bank v. Walser,* 162 N. C., 63. In *Bank v. Exum,
supra,* the *Chief Justice* said: "When there is evidence tending
to show fraud in the execution of the note, the burden is thrown
upon the plaintiff to show that it was a *bona fide* purchaser, and
not upon the defendants to show the negative of that proposi-
tion." So in this case, as the fraud was not only proved, but
admitted, we start with the burden on the plaintiff to establish
that it was a purchaser in due course; which is, that it acquired
the notes in good faith, for value, before "overdue" and with-
out notice of the defenses against it. It was for the jury, there-
fore, to decide whether these facts had been shown to their satis-
faction.

And this disposes of the second assignment of error, which
was that the court refused to charge the jury to find for the
plaintiff on the second issue, that it was a holder in due course,
if they believed the evidence, for there surely was some evidence
in the case, if not very strong proof, that it did not buy in good
faith without notice of the fraud. As the fraud was admitted,
the burden was on the plaintiff to show the transaction to be

such as will sustain its right to recover upon the paper. This is the just principle, and is in perfect accordance with the rule that the burden should rest upon him who has peculiar knowledge of the facts to be proven, at least in the first instance. The defendant in this case may show actual or constructive notice of the fraud in rebuttal, if plaintiff offers sufficient proof to require it, or he may rely on plaintiff's testimony. There may, therefore, be express notice, or such as is implied, or to be inferred from the circumstances, and the jury must find whether there has been either, or, more plainly and simply stated, whether plaintiff knew of the fraud or should have known of it. In finding the facts, the jury could consider, of course, that the transaction was an unusual one and not likely to be engaged in by prudent business men; and also the relations of the parties and other circumstances which are calculated to cast a well-grounded suspicion upon the dealings between the parties with reference to the paper.

It appears that the importing company was, at the time, largely indebted to plaintiff, and desired a further extension of credit. Sterling R. Holt was surety on the note for the existing indebtedness, and the bank promised, upon the giving of this and other similar collateral notes, to lend, and it did lend, a large additional sum to the importing company. In view of these admitted facts, the bank agrees to take the collaterals without the slightest inquiry as to the solvency of the makers, and discharges the borrower, who had property subject to execution, from all liability by permitting an indorsement "without recourse" to it. This looks gravely suspicious, and required full and frank explanation, which the cashier did not give. His testimony is unsatisfactory, if we say the least of it, and may fairly be considered as inconsistent, if not contradictory. He evidently did not wish to discharge the importing company as indorsers, but it insisted that this be done. The bank made no effort to collect from the importing company upon the original or principal indebtedness, but, at the urgent request or upon the "insistence" of the importing company, it pursued the defendants first, having, at the time, a solvent principal to the original

debt who was within easy reach and to whom it could look for payment. Was it not natural for him to have inquired why the importing company should not only request, but insist, that the bank should first sue defendants before resorting to it for payment of the secured debt? It may have been accommodation to the company, but it was none to the bank, as it was a distinct inconvenience and detriment when it is considered that the principal indebtedness secured by the collaterals was good, the company and Holt, the indorser, being solvent, and that defendants lived in a distant State. This circumstance may not be very strong, but it, at least, adds to the suspicion, and should be met by a full and candid avowal of the truth.

The conduct of the importing company and the unusual character of its dealings with the bank were enough to "open its eyes" and cause it to scrutinize the transaction and to inquire as to the validity of the notes and the solvency of the defendants. A careful business man, it seems, would, at least, have done this much. To risk a large loan upon security of which it had no knowledge was a hazardous, if not a haphazard way of conducting its business. It was almost extraordinary, and could only impress the jury with the conviction that there was something wrong, and that all this uncommon method of dealing in such important matters was intended to conceal a secret understanding between the parties by which the importing company should be favored in the collection of this debt through a third party, in order to avoid the legal consequences of its own admitted and fraudulent act. It tended to show that it was not a real transaction, but a simulated one—a mere pretense or feigned device to avoid condemnation of the note. Instead of proceeding upon safe and sound business principles, and according to the usual practice in such cases, it was risking its money upon the merest chance of recovering it back with its interest.

There are other views that might be advanced, but this is sufficient to show that there was evidence for the jury upon the question whether the bank had notice of the fraud. The importing company has confessed to one fraud, and was conspiring with the bank to commit another upon defendants, so the

jury found upon ample evidence, as they believed that honest and prudent business men do not deal that way, but rather pursue correct methods. Jones on Evidence (1908), sec. 49, says: "Presumptions of this character are perhaps most frequently indulged in in respect to negotiable paper. It is presumed that such paper was regularly issued for a valuable consideration, and that the payee or the one who has purchased it before maturity is a *bona fide* holder and entitled to recover the full amount. But if the defendant can show that the note was originally obtained by duress, secured through fraud, or that it was lost or stolen, the burden is changed, and the presumption then arises that the guilty person will part with the instrument for the purpose of enabling some third party to recover for his benefit." The law says that where fraud in procuring the note is shown, and especially where it is admitted, it calls for explanation from the indorsee, who claims to hold the note *bona fide* and for value and without notice, and to have taken it before overdue, and, therefore, casts the burden upon him to defend his title and to show that it was honestly acquired. This burden has not been discharged by the plaintiff, so as to suggest more proof from the defendants.

It follows from what we have said that the evidence of the cashier, upon which we have thus commented, was competent and relevant, and therefore properly admitted by the court, and that the plaintiff's prayer for a peremptory instruction, or what amounted to it, should not have been given.

It was not alone sufficient that plaintiff should have given value; the other facts must appear which are required to constitute a purchaser in due course. The note must have been taken in good faith before it was overdue, and without notice of the fraud. We are not deciding that the qualified indorsement of the paper is evidence, by itself, of notice so as to discredit the paper, for we held otherwise in *Evans v. Freeman,* 142 N. C., 61, and *Bank v. Hatcher,* 151 N. C., 359, to which authorities may be added the following: "The expression, 'without recourse,' does not throw any suspicion on the paper, or affect the *bona fide* character of a purchaser, although it may

BANK *v.* BRANSON.

be evidence that value was not received by the indorser. Neither
will such addition affect the negotiability of the instrument."
2 Randolph on Commercial Paper (2 Ed.), sec. 722; 1 Daniel
Neg. Instr., 627; 1 Edw. Bills and Notes, sec. 398; *Stevenson
v. O'Neal,* 71 Ill., 314; *Kelley v. Whitney,* 45 Wis., 110; *Bor-.
den v. Clark,* 26 Mich., 410; *Richardson v. Lincoln,* 46 Mass. (5
Metc.), 201; *Russell v. Ball,* 2 Johns (N. Y.), 50; *Thorpe v.
Mindeman,* 123 Wis., 149 (107 Am. St., 1003); *Brotherton v.
Street;* 124 Ind., 599, and other authorities cited in *Evans v.
Freeman, supra.* It was held in *Stevenson v. O'Neal, supra,*
314: "In a suit by the assignee in good faith and for value, of
a note assigned, without recourse and before maturity, and with-
out any knowledge on the part of the assignee of any claim of
defense by the maker, the mere fact that the assignment is with-
out recourse is not sufficient to charge the assignee with notice
of a defense against the note, on the part of the maker, nor is it
sufficient to put him on inquiry in reference thereto." The
Court said in *Kelley v. Whitney, supra,* 110, 117: "The note,
it is claimed, was indorsed by the payee and mortgagee 'without
recourse.' But that is not sufficient to charge the assignee with
notice of a defense against the note, on the part of the maker,
nor is it sufficient to put him on inquiry in reference thereto."
And in *Borden v. Clark, supra,* it was held that, "The fact of
the vendor of a promissory note indorsing it 'without recourse'
has no tendency to show that his vendee is not a *bona fide* pur-
chaser." And again: "The proposition relied upon by the
plaintiff in error, that the indorsement being without recourse,
tended to show that the plaintiff had not taken the note *bona
fide,* is equally without foundation, and requires no comment."
In that case the note was given for a patent right. This, though,
is far from holding that such a qualified indorsement may not
be considered as a circumstance, with others, "to aid in creating
a suspicion and put the assignee on inquiry," as said in *Steven-
son v. O'Neal, supra.*

The bank held a large debt against the importing company,
and took these collaterals to secure it, and for a large additional

165—23

loan, as plaintiff would have us believe, and released the payee of the collateral notes from all liability in them (*Rice v. Stearns,* 3 Mass., 225), which, of course, required the bank to rely solely upon the solvency of the makers, and all this was done without the slightest inquiry into their financial ability to pay the notes or their responsibility therefor. Alone, this kind of indorsement does not cloud the note or affect the position of the indorsee as a holder in due course; but it may become evidence if combined with other suspicious facts. "Where a party (says the Court in *Stevenson v. O'Neal, supra,* citing *Russell v. Hadduck,* 3 Gilm., 233) is about to receive a bill or note, if there are any such suspicious circumstances accompanying the transaction, or within the knowledge of the party, as would induce a prudent man to inquire into the title of the holder or the consideration of the paper, he shall be held bound to make such inquiries; or if he neglects so to do, he shall hold the paper subject to all equities. In other words, he shall act in good faith, and not willfully remain ignorant when it was his duty to inquire into the circumstances, and know the facts." In our case there were suspicious circumstances, which were properly submitted to the jury upon the question of plaintiff's standing as a *bona fide* indorsee, and they tended to show that there was notice of the fraud, if not fraudulent collusion between the parties to deprive the payees of their defense to the note.

We find no error in the record.

No error.